**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**

| | |
|---|---|
| CALEB CHO, Individually and on Behalf of All Others Similarly Situated,<br><br>       Plaintiff,<br><br>     v.<br><br>BABCOCK & WILCOX ENTERPRISES, INC., KENNETH M. YOUNG, and CAMERON FRYMYER,<br><br>       Defendants. | Case No.<br><br>**<u>CLASS ACTION COMPLAINT</u>**<br><br>**<u>JURY TRIAL DEMANDED</u>** |

Plaintiff Caleb Cho ("Plaintiff"), individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Babcock & Wilcox Enterprises, Inc. ("B&W" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial, additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

1

**NATURE OF THE ACTION**

1.      This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired B&W securities between November 5, 2025 and March 11, 2026, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.      B&W, together with its subsidiaries, provides energy and emissions control solutions to industrial, electrical utility, municipal, and other customers in the U.S., Canada, the United Kingdom ("U.K."), Indonesia, and the Philippines.

3.      B&W's largest shareholder is BRC Group Holdings, Inc. ("BRC"), formerly B. Riley Financial, Inc.  BRC's Co-Chief Operating Officer ("CEO") and Chairman of its Board of Directors is Bryant R. Riley ("Riley").

4.      On November 4, 2025, B&W announced its entry into an agreement for a limited notice to proceed—that is, a preliminary agreement that envisioned a more definitive agreement in the coming months—for a project to deliver power (the "Power Generation LNTP") for an artificial intelligence ("AI") factory owned and operated by Applied Digital Corporation ("Applied Digital").  Defendants repeatedly touted the purported value of the Power Generation LNTP "***at over $1.5 billion***".  Defendants did not disclose any involvement on the part of the Company's largest shareholder, BRC.

5.      Also on November 4, 2025, B&W issued a press release reporting its financial results for the fiscal quarter ended September 30, 2025 (the "Q3 Earnings Release"), in which Defendant Kenneth M. Young ("Young"), B&W's Chairman and CEO touted the Power

Generation LNTP's purportedly "***profound***"[1] impact on the Company's "pipeline" and claimed that the eventual contract pursuant to the Power Generation LNTP "would serve as upside" to the Company's projected financial performance in the fiscal year 2026.

6. That same day, B&W entered into a sales agreement with BRC and Lake Street Capital Markets, LLC in connection with the offering of ***up to $200 million*** of the Company's common stock (the "ATM Offering"), raising additional capital following the announcement of the Power Generation LNTP.

7. On November 5, 2025, Defendants filed a prospectus on Form 424B5 with the SEC in connection with the ATM Offering (the "Prospectus").

8. On November 7, 2025, Defendants issued a press release (the "ATM Offering Release") announcing that they had raised ***$67.5 million*** through the ATM Offering, "including ***approximately $50 million*** from a single fundamental global institutional investor". In this press release, Defendants explicitly connected the ATM Offering to the Power Generation LNTP, stating that the ATM Offering "closely follows" the Power Generation LNTP. Defendants also announced that they were pausing the ATM Offering, before reversing course less than one week later.

9. The market responded favorably to these updates, as B&W's stock price rose ***over 198%*** from $3.74 on November 4, 2025, the last trading session before the Company announced the Power Generation LNTP and issued the Q3 Earnings Release, to $11.15, on February 3, 2026.

10. BRC acted quickly to take advantage of B&W's inflated stock price. On February 11, 2026, BRC, related entities BRF Investments, LLC and B. Riley Securities, Inc., and Riley, BRC Co-CEO and Chairman, filed a statement of changes in beneficial ownership on Form 4 with

---

[1] All emphases herein added unless otherwise indicated.

the SEC, disclosing that **BRC sold its entire directly-held position** in B&W common stock valued at approximately **$10.4 million**.  BRC executed this sale at a stock price of $9, which was **140%** greater than B&W's closing stock price on November 4, 2025, the last trading session before the Company announced the Power Generation LNTP and issued the Q3 Earnings Release.

11.     On March 4, 2026, B&W issued a press release (the "Power Generation Contract Release") announcing it had "received full notice to proceed on a **$2.4 billion** design-build agreement with Base Electron, an independent power producer ("IPP") backed by Applied Digital . . . to deliver project 1.2 gigawatts (GW) of new generation capacity" (the "Power Generation Contract").

12.     The market responded favorably to this news, as well.  B&W's stock price rose $3.70, or **45%**, to close at $11.80 on March 4, 2026.

13.     Defendants repeatedly touted the purported value of the Power Generation Contract as evidence that B&W's backlog[2] was robust, and that demand for B&W's products and services was strong.  However, Defendants did not disclose that if Base Electron defaulted on its obligations under the purportedly $2.4 billion agreement, **Applied Digital could unilaterally terminate its guarantee of Base Electron's obligations under the agreement for as little as $50 million**.

14.     Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operations, and prospects.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) B&W's largest shareholder, BRC, stood on both sides of the Power Generation Contract and had close ties to

---

[2] When reporting its financial results, B&W regularly reports on "bookings and backlog", which B&W describes as "our measures of remaining performance obligations under our sales contracts."  According to B&W, "[m]anagement believes these metrics provide investors, lenders and other users of our financial statements with a leading indicator of future revenues."

B&W's counterparty; (ii) Applied Digital did not need the products and services that B&W would purportedly supply pursuant to the Power Generation LNTP and Contract; (iii) the foregoing, at the very least, would raise questions about the parties' actual intent behind entering into the Power Generation LNTP and Contract, including whether the Company is likely to recognize revenues from these agreements; (iv) accordingly, the business and financial prospects of the Company were overstated; and (v) as a result, Defendants' public statements were materially false and misleading at all relevant times.

15. The truth began to emerge on March 12, 2026, when Wolfpack Research ("Wolfpack") published a short report alleging that B&W had failed to disclose the close relationship between its largest shareholder, BRC, and Base Electron, B&W's counterparty to the Power Generation Contract:  Base Electron's directors included BRC Co-CEO and Chairman Riley, and Base Electron's registered address matched that of BRC's headquarters, not Applied Digital's.  Moreover, Wolfpack alleged that Applied Digital did not need the products and services that B&W would purportedly provide pursuant to the Power Generation Contract, and that "the ultimate purpose of this deal may be to provide exit liquidity for [BRC]".  Taken together, the Wolfpack report's contentions called into question whether B&W was likely to recognize revenues from the Power Generation Contract.

16. Following publication of the Wolfpack report, B&W's stock price fell $1.71 per share, or 11.59%, to close at $13.05 per share on March 12, 2026.

17. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

18. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

19. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

20. Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b).  B&W is headquartered in this District, Defendants conduct business in this District, and a significant portion of Defendants' actions took place within this District.

21. In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

22. Plaintiff, as set forth in the attached Certification, acquired B&W securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

23. Defendant B&W is a Delaware corporation with principal executive offices located at 1200 East Market Street, Suite 650, Akron, Ohio 44305.  The Company's common stock, 6.50% senior notes due 2026, and 7.75% Series A cumulative perpetual preferred stock trade in an efficient market on the New York Stock Exchange ("NYSE") under the ticker symbols "BW", "BWNB", and "BW PRA", respectively.

24. Defendant Young has served as B&W's Chairman and CEO at all relevant times.

25. Defendant Cameron Frymyer ("Frymyer") has served as B&W's Executive Vice President and Chief Financial Officer at all relevant times.

26. Defendants Young and Frymyer are collectively referred to herein as the "Individual Defendants".

27. The Individual Defendants possessed the power and authority to control the contents of B&W's SEC filings, press releases, and other market communications. The Individual Defendants were provided with copies of B&W's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions with B&W, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements and omissions pleaded herein.

28. B&W and the Individual Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

29. B&W, together with its subsidiaries, provides energy and emissions control solutions to industrial, electrical utility, municipal, and other customers in the U.S., Canada, the U.K., Indonesia, and the Philippines.

7

30.     B&W's largest shareholder is BRC, formerly B. Riley Financial, Inc.  BRC's Co-CEO and Chairman is Riley.

**Materially False and Misleading Statements Issued During the Class Period**

31.     The Class Period begins on November 5, 2025.  On November 4, 2025, during post-market hours, B&W issued a press release announcing that it "has further solidified its entry into the AI Data Center power supply market", including an its entry into the Power Generation LNTP, which preceded entry into the Power Generation Contract.  The press release stated further, *inter alia*, that Defendants valued the project that this agreement concerned "***at over $1.5 billion***":

> B&W is . . . announcing an agreement for a limited notice to proceed for ***a project valued at over $1.5 billion*** to deliver one gigawatt of power for an [Applied Digital] AI Factory. Full contract release is anticipated in the first quarter of 2026.

> B&W plans to design and install the plant's four 300-megawatt natural gas-fired power plants consisting of proven boilers and associated steam turbines. The plant is targeted to begin operation in 2028.  B&W also expects to sign an ongoing parts and services contract to support the facility once commercial operation begins.

32.     The same day, also during post-market hours, B&W issued the Q3 Earnings Release, in which Defendants prominently highlighted the purported value of the Power Generation LNTP, stating *inter alia* that the Company "[s]igned limited notice to proceed for a more than $1.5 billion contract with Applied Digital to deliver and install one gigawatt of efficient energy for AI Data Center project."

33.     The Q3 Earnings Release quoted Defendant Young as touting the Power Generation LNTP's purportedly "***profound***" impact to the Company's "pipeline", stating *inter alia*:

> "This initial project with Applied Digital represents an exciting and transformational opportunity to broaden B&W's customer base as the Company expands into the rapidly evolving AI Data Center space," said Kenneth Young, B&W Chairman and Chief Executive Officer.  "***The impact from this deal on B&W is profound, adding over $3 billion to our pipeline which brings our total global pipeline to over $10 billion***.  It also marks a natural next step for our

8

Company, which has been a global leader in designing and deploying reliable and efficient steam generation systems for nearly 160 years."

34.    The Q3 Earnings Release also quoted Defendant Young as stating that the Power Generation LNTP, "when contracted, would serve as upside" to B&W's anticipated financial performance in the then-upcoming fiscal year, stating *inter alia*:

> [W]e anticipate 2026 Adjusted EBITDA from our core business in the range of $70 million to $85 million, showing significant sequential growth over 2025. ***This range does not include any AI Data Center projects, which, when contracted, would serve as upside to this forecast.*** B&W's recent data center project with Applied Digital demonstrates the core strengths of our Company, including our ability to provide reliable and efficient power generation solutions to our customers, and our extensive engineering, construction and project management experience. ***We remain optimistic about the significant upside across our business through the remainder of 2025 and into 2026 due to expected increases in parts and services revenue, as well as known data center projects in our pipeline***. ***We believe this extended demand for our technology and services continues to position us for sustained success and provides B&W with a strong outlook moving forward***.

35.    Later in the Q3 Earnings Release, it again quoted Defendant Young reiterating B&W's future prospects enjoyed a "strong foundation . . . to grow in the remainder of 2025 and beyond", pointing in part to the "global pipeline" of "over $10.0 billion", again referencing the purported impact of the Power Generation LNTP:

> ***We are seeing strong global demand for our diverse portfolio of technologies and as a result of recent data center opportunities, our global pipeline has increased to over $10.0 billion***. We continue to make progress on converting this pipeline of identified project opportunities into bookings, as displayed by our strong base business and backlog results this quarter. ***We expect industry tailwinds and generation demand to continue to increase in the coming years***, and we believe these tailwinds, coupled with our higher margins and improved cash flows, provide a strong foundation for B&W to grow in the remainder of 2025 and beyond.

36.    The market reacted positively to the news Defendants shared with the market on November 4, 2025.  On November 5, 2025, B&W's stock price rose $1.06, or ***approximately 22.1%***, to close at $3.74.

9

37. Defendants acted quickly to seize upon the positive news they released on November 4, 2025. That same day, B&W entered into a sales agreement with BRC and Lake Street Capital Markets, LLC in connection with the ATM Offering of *up to $200 million* of the Company's common stock.

38. On November 5, 2025, Defendants filed the Prospectus in connection with the ATM Offering.

39. On November 7, 2025, Defendants issued the ATM Offering Release, announcing that they had raised *$67.5 million* through the ATM Offering, "including *approximately $50 million* from a single fundamental global institutional investor". In this press release, Defendants stated that "the Company has elected to pause further sales under the ATM [Offering] at this time, having achieved its immediate capital objectives. Defendants explicitly connected the ATM Offering to the Power Generation LNTP, stating *inter alia*:

> Babcock & Wilcox Enterprises, Inc., ("B&W," or the "Company") (NYSE: BW) a leader in energy technology and solutions, announced today it has raised $67.5 million including approximately $50 million from a single fundamental global institutional investor, through its at-the-market (ATM) offering that opened on November 5, 2025. *This closely follows the recently announced Limited Notice to Proceed (LNTP) awarded to B&W in connection with a project valued at over $1.5 billion to design and install one gigawatt of electric power for an AI Factory and Data Center*.

40. Also in the ATM Offering Release, Defendant Young again alluded to Defendants' "significant project pipeline", in apparent reference to the Power Generation LNTP, stating *inter alia*:

> The rapid execution of this offering – raising $67.5 million in just two days – reflects the market's recognition of B&W's unique position to provide technology, services and solutions to meet the growing energy needs of AI factories and data centers, utilities and industrial customers around the world. *With our strong financial position, we are well-positioned to execute on our significant project pipeline* and continue to deliver value to our shareholders.

41. On November 10, 2025, B&W filed a quarterly report on Form 10-Q with the SEC, providing further detail on the financial results Defendants announced in the Q3 Earnings Release. Also on that date, B&W held a conference call to discuss the financial results detailed in the Q3 Form 10-Q (the "Q3 Earnings Call").  Defendant Young claimed that the project would have a "$1.5 billion" value "once finalized", and described "the impact from this deal" as "profound, adding $3 billion to $5 billion in AI data center opportunities in our pipeline": stating *inter alia*:

> We are pleased to announce that we have signed a limited notice to proceed with Applied Digital to begin work for the delivery and installation of natural gas technology that will provide 1 gigawatt of efficient energy for an AI factory and data center project. ***The total project valued at full notice to proceed will be over $1.5 billion in total once finalized***, and we anticipate that full notice to proceed to be released in the next few months.
>
> As a part of this deal, B&W plans to design and install 4 300-megawatt natural gas-fired power plants consisting of proven boilers and associated steam turbines to support Applied Digital's AI factory.  ***The plant is targeted to begin operation in 2028***.  This technology carries equal efficiency as simple cycle turbines and can be operational much faster than combined or simple cycle power plant options.  ***The impact from this deal on B&W is profound, adding $3 billion to $5 billion in AI data center opportunities in our pipeline***.

42. During Defendant Frymer's prepared remarks on the Q3 Earnings Call, he echoed Defendant Young's claim that the Company's guidance for fiscal year 2026 did not include any impact from the Power Generation LNTP, stating *inter alia*: "As Kenny stated earlier, we have announced our 2026 full year adjusted EBITDA target range of $70 million to $85 million stemming from our core business, which does not take into account any growth related to data centers."

43. Defendant Frymer also told investors that despite their earlier representation that they would "pause" the ATM Offering, Defendants had resolved to resume it, stating *inter alia*: "[A]lthough we said on Friday that we would be pausing sales under the ATM program, we've

11

decided to resume ATM sales and intend to sell shares under the ATM program opportunistically based on market conditions and our share price."

44. During the question and answer portion of the Q3 Earnings Call, several analysts asked questions concerning the Power Generation LNTP. In response to one of these questions, asking "how [Defendants] see potential contribution from a timing and margin perspective moving forward," Defendant Young indicated that BW could recognize between 10% and 15% of the projected $1.5 billion value of the Power Generation LNTP—*i.e.*, **$100 and $225 million in revenue**—during the fiscal year 2026, "**significant upside**" to the guidance Defendants provided the market, stating *inter alia*:

> As far as revenue recognition goes and margin recognition, obviously, we're a POC shop under that. It will depend on timing of when we can apply the cost to the project into next year. Some of that will be based on the final notice to proceed and the time frame there. ***So it's a little bit vague and it won't be terribly much, I would say, in '26. I don't know, I'm just throwing out a number, maybe 10%, 15% of the value would be realized then***. The bulk of it would — based on the accounting method would be realized more in the '27 and obviously '28.
>
> So we've — based on the fact that we're still finalizing that NTP and our guidance next year, ***we have not included this project or any other data center projects in that $70 million to $85 million range. So this would represent complete upside and probably significant upside to any number that we would be putting out right now***.

45. Another analyst asked Defendants whether the purported $1.5 billion value of the Power Generation LNTP was "all within B&W's scope," given that "it's a massive potential uptick to the backlog that you have today," to which Defendant Young affirmed that it did, that Defendants would complete construction necessary to provide Applied Digital's "AI Factory" with power pursuant to their eventual contract, and that the "total value could be higher depending on final scope", stating *inter alia*:

> ***[T]hat $1.5 billion would anticipate and represent BW scope as associated with this project,*** right? B&W would bring all of the aspects and elements of the boiler

and the steam capabilities plus the construction aspect, right?  We have our own construction company here in the U.S.  So it would be blended with construction, the steam turbines and the boiler aspect of it.  And then *we'll work through some of the other elements to complete the plant on time and on schedule*.  We'll work with Applied on that.  So *we put it as over $1.5 billion at that site*.  *The total value could be higher depending on final scope*, and we'll just have to work through that.  But I wanted to give some idea and indication of what it looks like from a B&W perspective.  So we intended that to be our scope.  The scope of the project would be a little bit larger under that scenario, but we'll work with them to complete that once we have the NTP finalized.

46.     On February 11, 2026, BRC, related entities BRF Investments, LLC and B. Riley Securities, Inc., and Riley, BRC Co-CEO and Chairman, filed a statement of changes in beneficial ownership on Form 4 with the SEC, disclosing that *BRC sold its entire directly-held position* in B&W common stock, valued at approximately *$10.4 million*.  BRC executed this sale at a stock price of $9, which was *140%* greater than B&W's closing stock price on November 4, 2025, the last trading session before the Company announced the Power Generation LNTP and issued the Q3 Earnings Release.

47.     On March 4, 2026, B&W issued the Power Generation Contract Release announcing it had "received full notice to proceed on a *$2.4 billion* design-build agreement with Base Electron, an independent power producer ("IPP") backed by Applied Digital . . . to deliver project 1.2 gigawatts (GW) of new generation capacity".  Also on March 4, 2026, the Company filed a current report on Form 8-K with the SEC, stating that the $2.4 billion agreement with "Base Electron, Inc., an Applied Digital Company . . . supersedes and replaces the limited notice to proceed previously disclosed by the Company".

48.     The Power Generation Contract Release quoted Defendant Young as touting the purported $2.4 billion value of the Power Generation Contract, stating *inter alia*, that "[r]eceiving full notice to proceed for *this $2.4 billion project* further underscores the strategic role B&W plays in supporting the rapidly expanding power needs of large-scale AI data centers," and that "[t]his

13

contract further reinforces our commitment to providing technologies that meet the urgent demand for reliable and secure power.”

49. Notably, the press release announcing the Power Generation Contract represented that Base Electron was a “newly formed *independent* power producer that was founded by the team at Applied Digital,” and described Base Electron as “backed by Applied Digital”. At no point in the Defendants did not disclose the connection between Base Electron and B&W’s largest shareholder, BRC, and BRC’s Co-CEO and Chairman, Riley.

50. Also on March 4, 2026, B&W issued a press release reporting its financial results for the fiscal quarter and year ended December 31, 2025 (the “Q4 Press Release”). Among other items, Defendants highlighted the Power Generation Contract, its purported $2.4 billion value and its purported impact to the Company’s “backlog”: “Signed full notice to proceed for a $2.4 billion AI data center project; . . . Continuing Operations Backlog of $2.8 billion, including the $2.4 billion data center project; . . . Backlog of $2.8 million with the inclusion of recent data cetner project, a 470% increase compared to the end of 2024.”

51. The Q4 Release also quoted Defendant Young as touting the Company’s purported backlog following the Power Generation Contract, and claiming that showed, in part the strength of demand for the Company’s products and services, stating *inter alia*:

> *We* have rightsized our balance sheet, reduced our debt, and *continued to develop a robust pipeline and backlog supplemented by innovative new partnerships*. We saw significant year-over-year increases in adjusted EBITDA and our core parts & services across 2025, indicating that the strategic actions we have implemented are delivering measurable bottom-line results. *We continue to make progress in converting our global pipeline of identified project opportunities and we believe these results reflect a strong global demand for our technologies*, underpinning our pipeline and outlook for sustained growth as we move into 2026.
>
> Building on our strong financial results, *our announcement of full notice to proceed on our project with Base Electron is an exciting step forward as B&W further expands into power generation for the rapidly evolving AI Data Center*

*space* . . . . The increasing need for power and electricity to support artificial intelligence and data center growth have become key drivers for momentum across our broad range of technologies. As a result of this surging demand, our global pipeline remains robust, exceeding $12.0 billion in project opportunities, after previously converting the $2.4 billion data center project from pipeline to backlog.

52. Like the Power Generation Contract Release, the Q4 Earnings Release did not disclose the connection between B&W's counterparty to the purported $2.4 billion agreement, Base Electron, and both B&W's largest shareholder, BRC, and BRC's Co-CEO and Chairman of its Board, Riley.

53. Finally, also on March 4, 2026, B&W filed a Current Report on Form 8-K concerning the Power Generation Contract (the "March 4 8-K"), disclosing that, of the Power Generation Contract's purported $2.4 billion value, approximately $434 million was a fixed fee. The remaining $1.96 billion was not guaranteed and was comprised of "Variable Charges . . . based on work performed" and "certain other amounts payable under the Definitive Agreement", which the Company declined to disclose for another five weeks, when it would file its quarterly report on Form 10-Q for the fiscal quarter ended March 31, 2026.

54. Like the Power Generation Contract Release and the Q4 Earnings Release, the March 4 8-K did not disclose the connection between B&W's counterparty to the purported $2.4 billion agreement, Base Electron, and B&W's largest shareholder, BRC, and BRC's Co-CEO and Chairman of its Board, Riley.

55. In the Current Report on Form 8-K that Applied Digital filed concerning the Power Generation Contract, Applied Digital used more conditional terms to describe this agreement, stating *inter alia* that B&W would "potentially supply[] power to [Applied Digital's] data center campuses under future separate power supply agreements. This Form 8-K also disclosed that Applied Digital had guaranteed Base Electron's performance of its obligations under the Power

15

Generation Contract, ostensibly including its obligation to pay up to $2.4 billion to B&W for products and services rendered pursuant to the Power Generation Contract, *but Applied Digital could discharge this sizable obligation by paying B&W as little as $50 to $100 million*.  This Form 8-K stated, *inter alia*:

> On February 26, 2026, Applied Digital Corporation ("Applied Digital" or the "Company") entered into a Guarantee (the "Guarantee") in favor of The Babcock & Wilcox Company (NYSE: BW) ("B&W"), pursuant to which Applied Digital has agreed to unconditionally and irrevocably guarantee the full and timely performance by Base Electron, Inc. ("Base Electron") of its obligations under that certain Design-Build Agreement, dated February 26, 2026, by and between Base Electron and B&W (the "Design-Build Agreement"). . . .

> Pursuant to the terms of the Guarantee, if Base Electron fails to perform any of its obligations under the Design-Build Agreement, the Company would be required, upon written demand by B&W, to perform such obligations or cause such obligations to be performed, including payment and specific performance. . . .

> *[T]he Company may, in its sole discretion, terminate the Guarantee and all of its existing and future obligations thereunder upon occurrence of any one of the following events*, (i) the listing of Base Electron's equity securities on a national securities exchange, (ii) the consummation by Base Electron of a financing transaction resulting in gross proceeds of at least $50 million (provided that Base Electron is current in its payments to B&W), or (iii) *the payment by the Company of a termination fee equal to either $50 million* (if paid by August 1, 2026 and Base Electron is current in its payments to B&W) *or $100 million*.

56.    The statements referenced in ¶¶ 31–35, 39–45, 47–54 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) B&W's largest shareholder, BRC, stood on both sides of the Power Generation Contract and had close ties to B&W's counterparty; (ii) Applied Digital did not need the products and services that B&W would purportedly supply pursuant to the Power Generation LNTP and Contract; (iii) the foregoing, at the very least, would raise questions about the parties' actual intent behind

entering into the Power Generation LNTP and Contract, including whether the Company is likely to recognize revenues from these agreements; (iv) accordingly, the business and financial prospects of the Company were overstated; and (v) as a result, Defendants' public statements were materially false and misleading at all relevant times.

### The Truth Begins to Emerge

57.     The truth began to emerge on March 12, 2026, when Wolfpack published a short report alleging that B&W had failed to disclose the close relationship between its largest shareholder, BRC, and Base Electron, B&W's counterparty to the Power Generation Contract. Wolfpack's report also alleged that Applied Digital did not need the products and services that B&W would purportedly provide pursuant to the Power Generation Contract, and that "the ultimate purpose of this deal may be to provide exit liquidity for [BRC]".  Wolfpack cited as evidence the *$10.4 million* sale of B&W Stock that BRC reported on February 13, 2026, as alleged *supra* ¶ 46.  Taken together, the Wolfpack report's contentions called into question whether B&W was likely to recognize revenues from the Power Generation Contract.

58.     The Wolfpack report specifically stated that when Defendants first announced the Power Generation Contract, they omitted key details concerning the relationship between BRC and B&W's counterparty, Base Electron.  First, while Defendants' March 4 8-K stated that Base Electron was "founded by the team at Applied Digital", it omitted that BRC Co-CEO and Chairman of the Board of Directors Bryant Riley was also one of Base Electron's directors. Second, while the March 4 8-K stated that Base Electron was an Applied Digital subsidiary, it omitted that Base Electron's registered address matched that of BRC's headquarters, not Applied Digital's.  Third, Base Electron's articles of incorporation were not filed until December 23, 2025, seven weeks after Defendants announced the Power Generation LNTP.  The counterparty to the

17

eventual Power Generation Contract *did not even exist* when the Power Generation LNTP was signed.

59. Wolfpack's report also undermined the contention that Applied Digital even needed the products and services that B&W would purportedly offer pursuant to the Power Generation LNTP and Contract. Wolfpack explained that Applied Digital's "more established" data center projects had already secured power through conventional grid agreements, and its review of Applied Digital's representations during relevant local government meetings concerning its prospective projects "suggests both will rely on existing grid power, consistent with its established campuses", rather than any new power plants that Defendants would purportedly construct. Moreover, Applied Digital could unilaterally terminate its guarantee of Base Electron's obligations on the purportedly $2.4 billion Power Generation Contract for as little as *$50 million*.

60. Taken together, the Wolfpack report's contentions called into question whether Defendants entered into the Power Generation LNTP and Contract for the benefit of B&W, particularly given that BRC stood on both sides of the transaction, with BRC Co-CEO and Chairman Riley a Base Electron director upon its December 23, 2025 founding, and capitalized on the increase in B&W's stock price following announcement of the Power Generation LNTP by selling its *entire directly-held position* valued at approximately *$10.4 million*. BRC executed this sale at a stock price of $9, which was *140%* greater than B&W's closing stock price on November 4, 2025, the last trading session before the Company announced the Power Generation LNTP and issued the Q3 Earnings Release. The Wolfpack report also called into question whether B&W is likely to recognize revenue from the Power Generation LNTP and Contract, given that Applied Digital's power supply needs were already met and it could terminate its guarantee of Base Electron's obligations for as little as *$50 million*.

18

61.     Following publication of Wolfpack's report, B&W's stock price fell $1.71 per share, or 11.59%, to close at $13.05 per share on March 12, 2026.

62.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## SCIENTER ALLEGATIONS

63.     During the Class Period, Defendants had both the motive and opportunity to commit fraud.  For example, during the Class Period, while disseminating the materially false and misleading statements alleged herein to maintain artificially inflated prices for B&W securities, Defendants enriched themselves by closing the ATM Offering for *$67.5 million*, before reopening it less than one week later, as alleged *supra* ¶¶ 37, 39, 43.  They also had actual knowledge of the misleading nature of the statements they made, or acted in reckless disregard of the true information known to them at the time.  Defendants repeatedly touted the purported $2.4 billion value of the Power Generation Contract, as alleged *supra* ¶¶ 47–48, 50–51, despite being aware that Applied Digital could discharge its obligation to guarantee Base Electron's performance under the Power Generation Contract for as little as $50 million, as alleged *supra* ¶ 55.  In so doing, Defendants participated in a scheme to defraud and committed acts, practices, and participated in a course of business that operated as a fraud or deceit on purchasers of the Company's securities during the Class Period.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

64.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired B&W securities during the Class Period (the "Class"); and were damaged upon the

19

revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

65. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, B&W securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by B&W or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

66. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

67. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

68. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

20

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of B&W;

- whether the Individual Defendants caused B&W to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of B&W securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

69. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

70. Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- B&W securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NYSE and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

21

- Plaintiff and members of the Class purchased, acquired and/or sold B&W securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

71. Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

72. Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

### (Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)

73. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

74. This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

75. During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of B&W securities; and (iii)

22

cause Plaintiff and other members of the Class to purchase or otherwise acquire B&W securities and options at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

76.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for B&W securities.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about B&W's finances and business prospects.

77.     By virtue of their positions at B&W, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants.  Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth.  In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

78.     Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.  As the senior managers and/or directors of B&W, the Individual Defendants had knowledge of the details of B&W's internal affairs.

23

79. The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of B&W. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to B&W's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of B&W securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning B&W's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired B&W securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

80. During the Class Period, B&W securities were traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of B&W securities at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of B&W securities was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of B&W securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

24

81.     By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

82.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

**(Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)**

83.     Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

84.     During the Class Period, the Individual Defendants participated in the operation and management of B&W, and conducted and participated, directly and indirectly, in the conduct of B&W's business affairs.  Because of their senior positions, they knew the adverse non-public information about B&W's misstatement of income and expenses and false financial statements.

85.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to B&W's financial condition and results of operations, and to correct promptly any public statements issued by B&W which had become materially false or misleading.

86.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which B&W disseminated in the marketplace during the Class Period concerning

25

B&W's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause B&W to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of B&W within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of B&W securities.

87.     Each of the Individual Defendants, therefore, acted as a controlling person of B&W. By reason of their senior management positions and/or being directors of B&W, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, B&W to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of B&W and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

88.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by B&W.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.     Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.     Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.     Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated:  April 14, 2026                              Respectfully submitted,

**DITTMER, WAGONER & STEELE, LLC**

*/s/ Robert J. Wagoner*
Robert J. Wagoner (0068991)
107 W. Johnstown Road
Gahanna, Ohio 43230
Telephone: (614) 471-8181
Facsimile: (614) 540-7473
Email: bob@dwslaw.com

**POMERANTZ LLP**
Jeremy A. Lieberman
(*pro hac vice* application forthcoming)
J. Alexander Hood II
(*pro hac vice* application forthcoming)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
jalieberman@pomlaw.com
ahood@pomlaw.com

*Attorneys for Plaintiff*